686 P.2d 842

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Earl J. REED, Defendant-Appellant.**

No. 14825.

Court of Appeals of Idaho.

July 31, 1984.

Earl J. Reed, pro se.

Jim Jones, Atty. Gen. by Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent.

BURNETT, J.

We are asked to decide whether the federal constitution bars the State of Idaho from requiring motor vehicle operators to carry proof of liability insurance. For reasons explained below, we hold that it does not. Accordingly, we affirm a judgment of conviction for failure to comply with an Idaho statute imposing this requirement.

I

While operating a pickup truck on a public highway at night, Earl J. Reed was stopped by an Ada County Sheriff's Deputy. The officer said he had observed a defective tail lamp on Reed's truck. Reed disputed the deputy's observation. He contended that both tail lamps were working and that a white light emitting from the rear of the truck was caused by a broken lens on a license plate lamp. The appellate record does not show whether the officer cited Reed for a tail lamp violation. In his brief, Reed states that he received no such citation. However, the record does disclose that during the traffic stop the officer asked to see Reed's driver's license, vehicle registration and certificate of liability insurance. When Reed failed to produce an insurance certificate, he was cited for a violation of I.C. § 49-245. That statute provides, in pertinent part, as follows:

> A certificate or proof of liability insurance shall be in the possession of the operator of every motor vehicle or present in every motor vehicle at all times when said vehicle is operated within this state. The certificate or proof of liability insurance shall be provided for inspection to any peace officer upon request to the operator of any motor vehicle. A violation of this section shall be a misdemeanor, provided that no person shall be convicted of violating this section if that person produces at any time prior to conviction the certificate or proof of liability insurance covering the motor vehicle that person is accused of operating in violation of this section, where such certificate or proof of liability insurance demonstrates the existence of liability insurance ... which was in effect at the time of occurrence of the violation of this section.

When Reed appeared before a magistrate, he presented no proof of liability insurance. To the contrary, he stated that he was uninsured, that he did not believe in

**164**

insurance, and that he considered I.C. § 49–245 to be unconstitutional. The magistrate rejected Reed's constitutional defense and adjudged him guilty of violating the statute. On appeal the district court affirmed. Reed appealed again, bringing the case before us.

## II

Reed's challenge to the validity of I.C. § 49–245 is grounded entirely upon the federal constitution. His principal arguments appear to be that the statute contravenes (a) the supremacy clause of article 6, cl. 2; (b) the fourth amendment's proscription against unreasonable searches and seizures; (c) the fifth amendment's privilege against self-incrimination; and (d) the guarantees of substantive due process and equal protection contained in the fourteenth amendment. Each of these points is discussed below. Other assertions by Reed, ostensibly based upon the ninth, tenth and thirteenth amendments, are not discussed because Reed has failed to make a colorable showing that those provisions apply to this case.

## A

We begin with the supremacy clause, not because it is dispositive but because Reed's reliance upon it exemplifies a common error in lay constitutional attacks upon duly enacted statutes. Article 6, cl. 2 provides:

> This Constitution, and the laws of the United States which shall be made in pursuance thereof ... shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding.

This section is complemented by article 6, cl. 3, which provides that "[t]he senators and representatives ... of the several state legislatures, and all executives and judicial officers ... shall be bound by oath ... to support this Constitution."

■ Upon these provisions Reed constructs a circular argument. He contends that I.C. § 49–245, which he denounces as a product of ill-conceived public policy, "has

never been proven to be in accordance to the Constitution." From that premise he urges that the statute is invalid, that our state legislators committed constitutional error by enacting it, and that the courts simply should do their constitutional duty by striking the statute down. Both the premise and the conclusion of this argument are fatally flawed. Although the constitutionality of the Idaho statute has not been adjudicated in a previously reported decision, similar statutes have been upheld against a variety of constitutional challenges. *See* cases cited in Comment, *Financial Responsibility Laws in Constitutional Perspective*, 61 CALIF.L.REV. 1072 (1973) [hereinafter cited as Comment, *Constitutional Perspective* ]; Annot., 35 A.L. R.2d 1011 (1954). More fundamentally, the lack of a prior determination of constitutionality would not signify, in any event, that a statute is invalid. It is well established that a statute carries a presumption of constitutionality. *E.g., Weller v. Hopper*, 85 Idaho 386, 379 P.2d 792 (1963). A statute is not invalid until proven constitutional; rather, it is valid until adjudicated unconstitutional.

■ Such an adjudication cannot be based solely upon a contention that the statute is unwise as a matter of policy. The federal constitution imbues judges with no general authority to strike down legislative enactments with which litigants, or even the judges themselves, might disagree. A statute may be held invalid only if it is shown specifically to abridge a constitutionally protected right or to exceed a constitutional limitation upon legislative power. A statute like I.C. § 49–245, requiring proof of motor vehicle liability insurance, falls squarely within the constitutionally recognized scope of a state's police power. *See generally* Comment, *Constitutional Perspective*. Consequently, our inquiry in this case is narrowed to the particular constitutional rights which Reed claims have been violated.

## B

Reed contends that the fourth amendment's proscription against unreasonable

searches and seizures is violated by a requirement that drivers exhibit proof of insurance upon request. The fourth amendment applies to states through the fourteenth amendment. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Reed asserts that if I.C. § 49–245 is upheld,

> [a]ny person who choses [sic] to operate a motor vehicle in the State of Idaho must relinguish [sic] all rights offered by the fourth amendment, and be prepared upon request with out [sic] warrant or probable cause, to prove they have in their possession, proof of liability insurance.

■ This assertion presumes that a police officer's request to see a certificate of liability insurance is a "search" governed by the fourth amendment. We disagree. The fourth amendment protects objectively reasonable expectations of privacy. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). A search in the constitutional sense occurs only when a legitimate privacy interest is invaded. The mere fact that an insurance certificate is issued by an insurance company rather than by the government does not, of itself, create a privacy interest. The insurance certificate, like a driver's license or a certificate of motor vehicle registration, is statutorily mandated evidence of compliance with state-imposed conditions for operating a motor vehicle upon the public highways. We believe that no legitimate privacy interest inheres in the documents themselves. Consequently, the fourth amendment is not offended by a requirement to produce the documents on request. Our view is consistent with a uniform body of court decisions upholding the constitutionality of statutes requiring drivers' licenses to be produced upon police request. *See* Annot., 6 A.L.R.3d 506 (1966); *cf. State v. Hobson*, 95 Idaho 920, 923, 523 P.2d 523, 526 (1974) (characterizing a policeman's request to see a driver's license as a "legitimate request" incident to a traffic stop).

■ Of course, this does not mean that the fourth amendment is blind to the circumstances surrounding such a police request. Where the request is incident to a traffic stop, the reasonableness of that stop may be put at issue. The United States Supreme Court, in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), has held that a traffic stop constitutes a "seizure," albeit brief, of the vehicle and its occupants. Consequently, the police are not vested with unrestrained discretion to detain motor vehicle operators. Rather, in order for the "seizure" to be reasonable, a stop must be supported by an articulable and reasonable suspicion that the vehicle is being driven contrary to the traffic laws or that either the vehicle or an occupant is subject to detention in connection with violation of other laws. *Id.* 440 U.S. at 661–63, 99 S.Ct. at 1400–1401.

■ In this case the magistrate implicitly found, and the record plainly shows, that the sheriff's deputy had reason to suspect a violation of the traffic laws. An officer who observes a white light on the rear of a forward-moving vehicle reasonably could suspect a defective tail lamp and would be entitled briefly to detain the vehicle for further inquiry. Such a stop would not constitute an unreasonable seizure. Once the stop had occurred, nothing in the fourth amendment would preclude the officer from routinely asking the motorist to exhibit his driver's license, the vehicle registration and an insurance certificate.

### C

Reed next contends that I.C. § 49–245 infringes upon the fifth amendment privilege against self-incrimination. The fifth amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." Like the fourth amendment, it is applicable to the states through the fourteenth amendment. *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

■ However, we are not persuaded that the fifth amendment is apposite to this case. Section 49–245 does not compel incriminating testimony. It merely requires

production of a nonincriminating document. It is well settled, as a general principle, that the fifth amendment affords no privilege against production of documents required by statute to be kept available for government examination. *See* Annot., 48 L.Ed.2d 852, 868 (1976). Of course, an exception to this principle may arise when the statute compels the recording and disclosure of violations of law. In such cases, a balance must be struck between fifth amendment values and the purposes served by the regulatory scheme in question. *See, e.g., California v. Byers,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971) (upholding the validity of a statute requiring reports of motor vehicle accidents). However, I.C. § 49–245 falls short of compelling motorists to report violations of the liability insurance requirement. Rather, it obligates them to demonstrate compliance with the requirement.

Nevertheless, this does not wholly dispose of the fifth amendment issue. A motorist who fails to exhibit an insurance certificate upon request is guilty of a misdemeanor unless he later presents in court proof of insurance in effect when the request was made. The police officer who issued the citation may testify at trial that no certificate of insurance was exhibited when requested. The trier of fact could infer from such testimony, unless rebutted by proof of insurance, that the motorist did not in fact possess a certificate as required by the statute. Therefore, the real effect of I.C. § 49–245 is not to compel incriminating testimony from the defendant; rather, it is to use against him the fact that he failed to comply with a police request. The question is whether such testimony impermissibly infringes upon a defendant's right to remain silent.

■ We believe it does not. As a matter of doctrinal consistency, the fifth amendment cannot be said to embody a right to silence broader than the underlying privilege against self-incrimination. As explained above, I.C. § 49–245 does not compel self-incrimination. Therefore, the use of a motorist's response, or failure to respond, to a police request for proof of insurance raises no fifth amendment question.

We recognize that in some circumstances the use of an accused person's silence might implicate the due process right to fundamental fairness. *See Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *State v. Urquhart,* 105 Idaho 92, 665 P.2d 1102 (Ct.App.1983). In *Doyle* a defendant in custody elected not to answer police questions after being admonished, pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that he had a right to remain silent. The Supreme Court held that fundamental fairness would be abridged—and the defendant's right to due process thereby would be denied—if the prosecution later were permitted to introduce evidence of silence notwithstanding the police admonition. However, our research discloses no case holding that a motorist should be excused, upon the ground of fundamental fairness, from exhibiting an insurance certificate after a *Miranda* warning has been given. Moreover, there is no evidence in this case that *Miranda* warnings were administered to Reed. Such warnings are not required during routine traffic stops unless the roadside questioning evolves into custodial interrogation. *Berkemer v. McCarty,* —— U.S. ——, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). We conclude that neither the fifth amendment right to silence nor the fundamental fairness component of due process has been violated in this case.

### D

We turn finally to Reed's claim that I.C. § 49–245 deprives him of substantive due process and equal protection of the laws. Although Reed purportedly bases this argument upon both the fifth and fourteenth amendments, our focus is upon the latter. The fourteenth amendment provides in pertinent part, that "[n]o state shall make or enforce any law which shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal

protection of the laws." The fifth amendment also protects due process, and has been construed to incorporate an equal protection guaranty. *E.g., Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975). However, it limits the powers of the federal government and is not directly germane to Reed's attack upon a state statute. *See Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

*Due Process*

In this appeal, Reed does not challenge the procedure by which a violation of I.C. § 49–245 has been charged and adjudicated. His attack is upon the liability insurance requirement itself. Consequently, the issue, as Reed has framed it, is not one of procedural due process. It is one of substantive due process—the right to be free from arbitrary deprivations of life, liberty or property.

The full, historical meaning of substantive due process is beyond the scope of this opinion. However, for nearly a century, the concept of substantive due process has been understood to embody the requirement that a statute bear a reasonable relation to a permissible legislative objective. *See, e.g., Allgeyer v. Louisiana,* 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897). Early in the twentieth century, the United States Supreme Court played an active role in determining whether legislation, particularly in social and economic areas, had a permissible objective. When legislation conflicted with vested property or contract rights, its objective was deemed impermissible and it was held to violate the guaranty of substantive due process. *E.g., Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). However, later in this century the Supreme Court shifted toward a more deferential view of social and economic legislation. This movement was typified by *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), where the Supreme Court, rejecting both substantive due process and equal protection attacks upon a state statute,

held that the statute need only serve a reasonably conceivable, legitimate objective. The Supreme Court intimated that it would reserve the more assertive standard of review for legislation dealing with such fundamental interests as individual civil rights. *See United States v. Carolene Products,* 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938).

■ A legislative requirement that motorists carry liability insurance falls within the social and economic domain reserved for the deferential standard of review. It is not only reasonably conceivable but manifest that this requirement serves the objective of reducing the economic hardship suffered by persons injured, or whose property is damaged, by financially irresponsible operators of motor vehicles. In *Adams v. City of Pocatello,* 91 Idaho 99, 416 P.2d 46 (1966), our Supreme Court upheld the legitimacy of this objective and stated that requiring drivers to procure liability insurance reasonably tends to accomplish this purpose. Requiring motorists to carry proof of such insurance, and to display it upon request, further secures the accomplishment of this purpose. Accordingly, we conclude that I.C. § 49–235 does not infringe upon substantive due process.

*Equal Protection*

i

Although the constitutional guaranty of equal protection does not lend itself to precise definition, it embraces the principle that all persons in like circumstances should receive the same benefits and burdens of the law. *See, e.g., Truax v. Corrigan,* 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254 (1921); *In re Mallon,* 16 Idaho 737, 102 P. 374 (1909). This principle obviously shares a common nexus with substantive due process. Both protect against arbitrary legislation. However, an equal protection inquiry is narrower than an inquiry concerning substantive due process. Equal protection focuses not upon the broad impact of a statute on life, liberty or property but upon any classification within the stat-

ute which allocates this impact differently among the categories of persons affected.

In this case, our initial task is to determine whether I.C. § 49–245 contains any such classification. In its memorandum decision, the district court identified a single classification—the distinction implicitly drawn between motorists and non-motorists. The court upheld this classification with the explanation that although motorists "are burdened with the cost of purchasing liability insurance to which non-motorists are not burdened, the statute confers equal duties on *all* citizens of a given class." (Emphasis original.) However, we believe the district court's analysis did not go far enough. It is no answer to an equal protection challenge merely to say that a statute accords equal treatment to all persons *within* a given class. An equal protection issue focuses upon differences *between* classes.

Moreover, we believe there is a second classification embodied by the compulsory liability insurance scheme. Idaho Code § 49–245 is an integral companion to I.C. § 49–236 which provides in pertinent part as follows:

> It shall be unlawful for any person to operate a motor vehicle upon highways, streets or roadways of this state without a valid policy of liability insurance ... unless such person has been issued a certificate of self insurance pursuant to section 49–1534, Idaho Code, or has previously posted an indemnity bond with the director of insurance. . . .

Thus, the Legislature has created two subclasses within the class of motorists—those motorists who are required to purchase liability insurance or an indemnity bond and those motorists who are entitled to receive a certificate of self insurance.

In this case Reed has claimed no infringement upon his right to post an indemnity bond in lieu of acquiring liability insurance. However, he does complain of his inability to apply for a self insurance certificate. Idaho Code § 49–1534 provides that a certificate of self insurance may be issued only to a person "in whose name more than twenty-five (25) motor vehicles are registered" and who satisfies the director of insurance that he "is possessed and will continue to be possessed of ability to pay judgments obtained against [him]." The question raised by this classification is whether equal protection is offended by the distinction drawn between motorists in whose names more than twenty-five motor vehicles are registered and those motorists who have fewer vehicles.

ii

■ Having identified these classifications, our next task is to determine the equal protection standard by which they should be tested. The United States Supreme Court has articulated standards which differ according to the nature of rights and interests affected. The most rigorous test, that of "strict scrutiny," requires a classification to be justified by a compelling state interest. However, this test applies only to "suspect classifications," such as those based upon race, and to classifications burdening "fundamental interests," such as public access to the courts. *E.g., Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956).

■ A more restrained standard, commonly termed the "rational basis" test, is analogous to the deferential test of substantive due process applied to social and economic legislation. Under this standard, a classification will be upheld if it is rationally related to a legitimate government objective. *E.g., Schweiker v. Wilson,* 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981); *Twin Falls Clinic & Hospital Building Corp. v. Hamill,* 103 Idaho 19, 644 P.2d 341 (1982). The United States Supreme Court, following the analogy to substantive due process, has held that a classification will be upheld upon any state of facts "that reasonably can be conceived to constitute a distinction, or difference in state policy. . . ." *Allied Stores, Inc. v. Bowers,* 358 U.S. 522, 530, 79 S.Ct. 437, 442, 3 L.Ed.2d 480 (1959); *see also Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981).

Clearly, a choice between these standards virtually would dictate the outcome of an equal protection inquiry. Few legislative classifications could survive "strict scrutiny," but few statutes would fail to pass a "rational basis" test. The apparent rigidity of each test, and the yawning chasm between them, have engendered critical commentary. As noted by Professor Laurence Tribe:

> [T]he all-or-nothing choice between minimum rationality and strict scrutiny ill-suits the broad range of situations arising under the equal protection clause, many of which are best dealt with neither through the virtual rubber-stamp of truly minimal review nor through the virtual death-blow of truly strict scrutiny, but through methods more sensitive to the risks of injustice than the former and yet less blind to the needs of government flexibility than the latter.

L. TRIBE, AMERICAN CONSTITUTIONAL LAW 1089 (1978).

There have emerged two categories of judicial response to this gap between the rational basis and strict scrutiny tests. One response has been to narrow the gap by adopting a less deferential version of the rational basis standard. The other response has been to fill the gap by adopting an intermediate standard. Both approaches may be found in Idaho appellate decisions.

The first approach is reflected in opinions by our court and by the Idaho Supreme Court, suggesting that in order for the relationship between a statute and its ascribed objective to be "reasonable," as required by the rational basis test, it must be "fair and substantial" rather than merely conceivable or debatable. *See, e.g., Kerr v. Department of Employment,* 97 Idaho 385, 545 P.2d 473 (1976); *Thompson v. Hagan,* 96 Idaho 19, 523 P.2d 1365 (1974); *Packard v. Joint School District No. 171,* 104 Idaho 604, 661 P.2d 770 (Ct.App.1983). However, this approach has failed to gain the adherence of the United States Supreme Court; and the Idaho Supreme Court recently has backed away from it.

In *Idaho Department of Employment v. Smith,* 434 U.S. 100, 98 S.Ct. 327, 54 L.Ed.2d 324 (1977), the United States Supreme Court overturned a decision of our state Supreme Court, reported at 98 Idaho 43, 557 P.2d 637 (1976), holding a statute unconstitutional upon the rational basis test. The Idaho court had relied heavily upon its earlier opinion in *Kerr v. Department of Employment, supra,* treating a "fair and substantial" relationship as part of the rational basis test. The United States Supreme Court implicitly disapproved *Kerr* by reversing *Smith.* The Supreme Court noted that it had "consistently deferred to legislative determinations concerning the desirability of statutory classifications affecting the regulation of economic activity and the distribution of economic benefits." 434 U.S. at 101, 98 S.Ct. at 328.

Perhaps as a result of *Smith,* the Idaho court recently has foregone any further attempts to strengthen the rational basis standard. In *Johnson v. Sunshine Mining Co.,* 106 Idaho 866, 870 n. 5, 684 P.2d 268, 272 n. 5 (1984), the court stated that it did not regard the "fair and substantial" requirement to be an element of the rational basis test. The court has adopted a more deferential version of the rational basis standard, enabling social or economic legislation to withstand an equal protection challenge "if there is any conceivable set of facts which will support it." *State v. Bowman,* 104 Idaho 39, 41, 655 P.2d 933, 935 (1982). Consequently, while strengthening the rational basis test—making it something more than a judicial rubber-stamp of legislative action—may remain a valid approach and may merit further scholarly attention, we are constrained to acknowledge that it is not now the law.

The second response to the gap between rational basis and strict scrutiny standards has been to devise an intermediate test. The United States Supreme Court has followed this approach in a number of recent decisions, employing various hybrid standards to require that statutes articulate more specifically the objectives they serve

and that they demonstrate greater congruence between those objectives and the classifications created. *See generally* TRIBE, *supra*, at 1082–89; J. NOWAK, R. ROTUNDA & J. YOUNG, CONSTITUTIONAL LAW (2d ed. 1983) 590–99. These hybrid tests have not coalesced into a single intermediate standard. However, a frequently recurring element is the requirement of a "fair and substantial" relationship. *See, e.g., Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), and *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (dealing with gender-based classifications). These hybrid formulations have been employed in cases where especially important, though not necessarily "fundamental," interests are at stake and in cases where unusually sensitive, although not necessarily "suspect," classes have been created. TRIBE, *supra* at 1089–97.

The Idaho Supreme Court also has moved toward an intermediate standard. In *Jones v. State Board of Medicine*, 97 Idaho 859, 555 P.2d 399 (1976), the court adopted a "means focus" test, describing it as whether a legislative classification "substantially furthers some specifically identifiable legislative end." *Id.* at 867, 555 P.2d at 407. The means focus test includes the element of a "fair and substantial" relationship. *See Johnson v. Sunshine Mining Co., supra.*

The court further stated in *Jones* that this new standard would be employed only "where the discriminatory character of a challenged statutory classification is apparent on its face and where there is also a patent indication of a lack of relationship between the classification and the declared purpose of the statute." 97 Idaho at 871, 555 P.2d at 411. Because a classification patently lacking a relationship to the legislative purpose would fail even the rational basis test, we are uncertain what the Supreme Court meant by its reference to a "patent indication of a lack of relationship." However, we believe the key language is the statement that the "discriminatory character of a ... classification" must be "apparent on its face." Our interpretation is consistent with a recent observation by the Supreme Court that the means focus test is reserved for statutes embodying "blatant" discrimination. *Tarbox v. Tax Commission of the State of Idaho*, No. 14883, slip op. at 4 (Idaho S.Ct. July 11, 1984). This criterion for applying an intermediate standard would appear to be broader than the United States Supreme Court's practice of using hybrid standards only where especially important interests or unusually sensitive classifications are at stake.

■ The failure of the United States Supreme Court to articulate a single intermediate standard, and the apparent difference between criteria employed by that Court and the Idaho Supreme Court in determining whether an intermediate standard should be employed at all, leave us with the task of synthesizing the appropriate standard and the criteria for applying it. Because we perceive no conflict between the "means focus" standard described by the Idaho Supreme Court and the various hybrid tests advanced by the United States Supreme Court, we will follow the Idaho formulation of the test—whether a legislative classification substantially furthers some specifically identifiable legislative end. As to the circumstances in which this test should be applied, the Idaho criterion seems to focus upon the blatant or obvious nature of the discriminatory impact while the federal criteria appear to focus upon the nature of the interests affected or classes created. Consequently, we cannot treat one set of criteria as being subsumed in the other. Rather, the criteria must be treated as cumulative. Accordingly, we will deem the means focus test to be applicable if a statute affects especially important interests, creates unusually sensitive classes, or otherwise blatantly discriminates.

iii

Our final task is to apply the proper standard to each of the two classifications

found within the compulsory liability insurance scheme. The general classification, distinguishing between motorists and non-motorists, does not appear to create suspect classes or to affect fundamental rights. Consequently, the strict scrutiny test is inapplicable. Moreover, the distinction between motorists and non-motorists does not appear to create unusually sensitive classes or to affect especially important interests. The persons and interests affected are those commonly impacted by social and economic legislation. Neither does the distinction between motorists and non-motorists blatantly lack a discernible relation to the legislative purpose. Therefore, we also deem the means focus test to be inapplicable.

■ We turn to the rational basis test. As noted above, this test simply is whether the classification advances legitimate legislative goals in a rational fashion. The goals need not be specifically identified in the legislation itself, but may be those which we regard as reasonably conceivable. In this case, we have already determined, in the foregoing discussion of substantive due process, that I.C. § 49–245 serves the legitimate public purpose of reducing the hardship that may result from use of motor vehicles by financially irresponsible persons. The classification between motorists and non-motorists is not only rationally related to this end but is a definitional requisite of it. Accordingly, we hold that the rational basis test is satisfied and that the general classification between motorists and non-motorists does not offend equal protection under the fourteenth amendment.

The second classification is the distinction drawn between those motorists who have twenty-five or more vehicles registered in their names and those who have fewer vehicles. Operators of fleets of twenty-five or more vehicles may apply for self insurance certificates; other persons may not. This classification, like the distinction between motorists and non-motorists, does not create suspect classes nor does it impact fundamental interests.

Therefore, the strict scrutiny standard does not apply. Neither do we believe the distinction between fleet owners and others creates unusually sensitive classes or impinges upon especially important interests, beyond those customarily affected by social and economic regulation. However, we do believe that allowing owners of many vehicles to apply for self insurance, while others may not do so, creates an obvious and plainly expressed discriminatory classification. Arguably, at least, it is "blatant" in the sense required to invoke the means focus test.

However, because the criteria for applying the means focus test may await further development by the Idaho Supreme Court, we are reluctant to rigidify the process by holding that the test necessarily is invoked by the classification involved here. Rather, it is sufficient to say that even if we assume, without deciding, that the test is applicable, we believe it has been satisfied.

The test is whether the restriction upon the right to apply for a self insurance certificate substantially furthers a specifically identifiable legislative end. Again, the general purpose of the liability insurance scheme is to reduce the hardship suffered by persons who are injured, or whose property is damaged, by financially irresponsible operators of motor vehicles. This purpose pervades Idaho's Motor Vehicle Safety Responsibility Act, I.C. §§ 49–1501 to –1540, and the other provisions of Title 49, such as §§ 49–235 and 49–245, which implement the purpose of the Act.

By limiting applications for self insurance certificates to fleet operators, the Idaho Legislature has narrowed an exception to the general requirement that vehicle operators carry liability insurance. This requirement manifestly is aimed at those motorists who otherwise would not obtain insurance voluntarily. Narrowing an exception to the insurance requirement plainly advances the purpose served by that requirement. Absent such a narrowing restriction, every motorist who would not voluntarily obtain insurance could apply for a self insurance certificate. The self insur-

ance exeption would swallow the liability insurance rule. Moreover, the restriction upon self insurance applications makes it feasible for the director of insurance to make particularized determinations of those applicants who are capable, and likely to remain capable, of satisfying judgments against them arising from motor vehicle accidents. If the restriction were removed, continued feasibility of this scheme would be threatened.

■ Therefore, we hold that the statutory classification limiting self insurance to qualified fleet operators substantially furthers the legislative objective of financial responsibility. The classification satisfies the means focus test and, *a fortiori*, also would satisfy the rational basis test. Because that classification is valid, the statutory requirement that other motorists carry certificates of liability insurance (or post an indemnity bond) is similarly valid.

Having found no constitutional infirmity in the liability insurance scheme, nor in the specific statute upon which Reed was charged and convicted, we affirm the district court's decision sustaining the judgment of conviction.

WALTERS, C.J., and SWANSTROM, J., concur.