826 P.2d 452

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Robert GODWIN, Defendant-Appellant.**

**No. 19223.**

Supreme Court of Idaho,
Coeur d'Alene term, October 1991.

Feb. 5, 1992.

Hollis J. Anderson, Wallace, for defendant-appellant.

Hon. Larry J. EchoHawk, Atty. Gen., Myrna A.I. Stahman, Deputy Atty. Gen., Boise, for plaintiff-respondent. Myrna A.I. Stahman argued.

BAKES, Chief Justice.

Appellant Robert Godwin entered a conditional plea of guilty to the charge of possession of a controlled substance, reserving the right to appeal the district court's denial of his motion to suppress evidence. The Court of Appeals affirmed the district court's decision to deny Godwin's motion to suppress. 121 Idaho 517, 826 P.2d 478. We granted Godwin's petition for review of the Court of Appeals decision and now affirm.

The Court of Appeals described the facts as follows:

The facts of this case began during the late evening hours of April 14, 1989, when Officer Chris Yount, of the Idaho State Police, stopped a vehicle driven by Alicia Whitifield because of an equipment violation. As Officer Yount contacted Ms. Whitifield, another vehicle, operated by Godwin, stopped on the highway approximately 100 yards ahead. While Yount was conversing with Whiti-

field, Bonner County Deputy Sheriff Todd Barbieri happened to drive by and, upon seeing the situation, activated his rear deck lights and pulled in behind Godwin's vehicle. Deputy Barbieri notified dispatch that he was making a "motorist assist."

As Deputy Barbieri exited his vehicle, he was told by Officer Yount that Whitifield believed her driver's license was in her purse which was in Godwin's vehicle. Deputy Barbieri approached Godwin's vehicle and was told that Godwin was following Whitifield to her residence because she had been having problems with her vehicle. Godwin located Whitifield's purse, but neither Godwin nor Barbieri were able to find her driver's license. Deputy Barbieri then asked Godwin for his driver's license, and Godwin gave him a Washington license. Deputy Barbieri returned to his vehicle and conducted a driver's license check. Dispatch shortly thereafter notified him that Godwin's license had been suspended by the State of Washington.

Because Deputy Barbieri had never dealt with such a situation, he requested assistance from Officer Yount. Officer Yount then spoke with Godwin about the status of his license and subsequently arrested him for driving with a suspended license.

After Godwin's arrest, Deputy Barbieri did an inventory search of Godwin's vehicle. [footnote omitted] When Deputy Barbieri looked under the front seat he found three plastic bags. The first contained a white powdery substance, the second held a number of bindles, and the third contained a green leafy substance. The powdery substance and bindles field-tested positive for cocaine.

Godwin was charged with possession of cocaine with intent to deliver. Counsel for Godwin filed a motion to suppress the evidence obtained during the inventory search. The district court denied Godwin's motion, holding that the request for Godwin's driver's license and subsequent record check were reasonable. The charges against Godwin were subsequently reduced to possession of cocaine,

and he entered a conditional plea of guilty, reserving the right to pursue this appeal from the district court's denial of his motion to suppress.

The Court of Appeals upheld the district court's denial of Godwin's motion to suppress, concluding that "the officer's request for Godwin's license and his subsequent record check pass the Fourth Amendment's test of reasonableness...." We granted review of the Court of Appeals decision and now affirm.

■ Regarding our standard of review, when we are asked to review a decision of the Court of Appeals, we review the opinion of the district court directly. While we seriously consider the views of our Court of Appeals, we are not bound by those views. *Clements Farms, Inc. v. Ben Fish & Son*, 120 Idaho 185, 814 P.2d 917 (1991); *State ex rel Evans v. Barnett*, 116 Idaho 429, 776 P.2d 438 (1989).

In a broad sense, the issue we face in this case is whether the trial court correctly denied Godwin's motion to suppress. However, in order to make such a determination, we must answer the following, more specific questions: (1) did a seizure occur; (2) if so, when did it occur; and (3) was it reasonable?

Both sides concede, and we agree, that Godwin was clearly "seized" at some point on the night of April 14, 1989. The parties do not agree, however, as to precisely when that seizure occurred, and both sides, at various points in this case, have changed their position on this issue. In its original brief before the Court of Appeals, the State wrote: "Admittedly, at the time Deputy Barbieri asked for Godwin's driver's license and then asked Godwin to wait in his vehicle while he did a wants check and driver status check a limited seizure of Godwin occurred." Later, however, at oral argument before this Court, counsel for the State denied that the seizure occurred when Officer Barbieri asked for Godwin's driver's license and instructed him to remain in his car. Instead, the State argued that a seizure did not occur until Officer Yount actually arrested Godwin, after Offi-

cer Barbieri had taken and checked the license. Counsel for Godwin has also changed her position on when the seizure occurred. Apparently, Godwin's counsel argued before the Court of Appeals that the seizure occurred when Officer Barbieri asked for Godwin's driver's license. However, at oral argument before this Court, counsel conceded that Officer Barbieri's conduct in merely asking for the driver's license may have been too limited to be considered a seizure in the constitutional sense. Instead, counsel argued before us that the seizure occurred when Officer Barbieri took Godwin's license to run a record check and instructed Godwin to remain in his car.

■ The Fourth Amendment of the U.S. Constitution states:

The right of the people to be secure in the persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.... 

The U.S. Supreme Court has held that even a brief stop may be considered a seizure for Fourth Amendment purposes. In *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578–79, 45 L.Ed.2d 607 (1975), the Court stated: "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.... '[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person,'...." 422 U.S. at 878, 95 S.Ct. at 2578–79 (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Idaho has adhered to this view. *See, Matter of Clayton*, 113 Idaho 817, 819, 748 P.2d 401, 403 (1988) ("It is true that whenever a police officer accosts an individual and restrains his freedom to walk away—even briefly—the officer has 'seized' that person."); *State v. Simpson*, 112 Idaho 644, 645, 734 P.2d 669, 670 (Ct.App.1987) ("Stopping an automobile and detaining its occupants will be deemed a seizure under the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.' "); *State v.*

*McAfee*, 116 Idaho 1007, 783 P.2d 874 (Ct. App.1989).

■ Based on these cases, we agree with what appears to be the middle ground between the various views taken by each side and conclude that a limited seizure occurred when Officer Barbieri took Godwin's license and told him to remain in his car. At this point, Godwin was arguably not free to leave. *Brignoni–Ponce; Terry v. Ohio; Clayton, supra.*

■ Having concluded that a limited seizure occurred when Officer Barbieri told Godwin to remain in his car, we must next determine whether, under the circumstances, the seizure was reasonable. We find that it was.

In *State v. Reed*, 107 Idaho 162, 686 P.2d 842 (Ct.App.1984), a somewhat similar case, the defendant claimed that a requirement that he show proof of insurance to a police officer upon request during a traffic stop was in violation of his fourth amendment protections against unreasonable searches and seizures. In *Reed*, the Court of Appeals concluded:

[T]he fourth amendment is not offended by a requirement to produce the documents on request. Our view is consistent with a uniform body of court decisions upholding the constitutionality of statutes requiring drivers' licenses to be produced upon police request. *See* Annot., 6 A.L.R.3d 506 (1966); *cf. State v. Hobson*, 95 Idaho 920, 923, 523 P.2d 523, 526 (1974) (characterizing a policeman's request to see a driver's license as a "legitimate request" incident to a traffic stop.

107 Idaho at 165, 686 P.2d 842. The Court of Appeals then held that "[o]nce the stop had occurred, nothing in the fourth amendment would preclude the officer from routinely asking the motorist to exhibit his driver's license, the vehicle registration and an insurance certificate." 107 Idaho at 165, 686 P.2d 842.

Several other jurisdictions which have confronted this, or a similar issue, have held that a limited seizure, such as that which occurred in this case, to check a driver's license is reasonable. We find

*State v. Ellenbecker,* 159 Wis.2d 91, 464 N.W.2d 427 (App.1990), particularly persuasive.

In *Ellenbecker,* a police officer stopped behind a disabled vehicle on the side of the road to see if the passengers needed his assistance. Although he ultimately determined that the driver and passenger did not need his help, he nevertheless asked the driver, Ellenbecker, for his driver's license. After running a check on the license, the officer learned that it had been revoked. Ellenbecker was subsequently arrested, and during a search of both Ellenbecker and his car, the officer discovered, among other things, packets of marijuana, vials of hash oil, and twenty-nine packets of LSD. Similar to the issue in this case, the issue in *Ellenbecker* was "whether an officer who learns that a motorist needs no assistance may still demand to see a driver's license and conduct a status check at the scene." *Ellenbecker,* 464 N.W.2d at 428.

Holding that the officer's actions were reasonable, the Wisconsin court stated that "the public interest in permitting an officer to request a driver's license and run a status check during a lawful police-driver contact outweighs the minimal intrusion on the driver." 464 N.W.2d at 428. The *Ellenbecker* court reasoned:

> There are several reasons for permitting a police officer performing a motorist assist to ask for a driver's license. In many cases, police officers are required to make a written report of contacts with citizens. An officer needs to know whom he or she is assisting in the event a citizen later complains about improper behavior on the part of the officer or makes any kind of legal claim against the officer. Moreover, even seemingly innocent activity, such as refueling a disabled car, could later turn out to be theft of a car that was left on the shoulder of the highway.
>
> Section 343.18(1), Stats., implicitly recognizes this public interest by giving a law enforcement officer the authority to require a driver of a motor vehicle to display his or her license on demand. Police officers do not have unfettered discretion to stop drivers and request a display of a driver's license.... However, *this case does not concern an instance of unfettered discretion. Ellenbecker was not singled out for a spot check of his license. His car was already stopped when the inspector offered help. The request for Ellenbecker's license was reasonable in these circumstances.*
>
> There is also a public interest in permitting a police officer to run a status check on a license. The statutory authority for police to demand a driver's license would mean little if the police could not check the validity of the license. The reason for allowing police to request a driver's license on demand is to deter persons from driving without a valid license, since a license is a statement that the driver can be expected to comply with the state's requirements for safe driving. Where it is reasonable for a police officer to ask for a license, running a status check on the license is simply carrying out this deterrent function of the law.
>
> While there is a legitimate public interest in a police officer requesting a driver's license during a motorist assist and in running a status check on the license, these interests must outweigh any intrusion on the citizen in order for the police action to pass the fourth amendment test of reasonableness.... Requesting a license and conducting a status check after a lawful contact is but a momentary occurrence. The intrusion is minimal at best.

464 N.W.2d at 429–430 (emphasis added). *See also, State v. Tourtillott,* 618 P.2d 423, 434–35 (Or.1980) ("We are aware of no prohibition against an officer asking a driver for an operator's license when a driver is validly stopped, whatever be the reason for the stop. Oregon motorists are required to have a valid operator's license in their possession while operating a car and, upon demand, to show it to any peace officer."); *State v. Aguinaldo,* 71 Haw. 57, 782 P.2d 1225, 1229 (1989) ("We ... hold that the police has the power and authority to demand from the driver of a vehicle the pro-

duction of both [a driver's license and proof of insurance] whenever the vehicle is validly stopped.").

We are convinced that the views expressed in both *Reed* and *Ellenbecker* are correct. In *Brignoni–Ponce, supra,* the U.S. Supreme Court stated, "As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures [brief detentions short of traditional arrest] depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." 422 U.S. at 878, 95 S.Ct. at 2579. Balancing the various public interests in this case, which we discuss below, against Godwin's "right to personal security from arbitrary interference by law officers," we conclude, as did the *Ellenbecker* court, that a police officer's brief detention of a driver to run a status check on the driver's license, after making a valid, lawful contact with the driver, is reasonable for purposes of the fourth amendment. The Court of Appeals very adequately explained why a subsequent check of Godwin's license, after Officer Barbieri made the initial, lawful contact, was both reasonable and appropriate under the circumstances:

> Here, Deputy Barbieri testified that there were two reasons he contacted the driver of the vehicle. He believed he needed to determine if a motorist stopped on the highway required assistance, and he was somewhat concerned for the safety of Officer Yount because he believed the two vehicles may have been traveling together. There are several reasons for permitting a police officer to ask for a driver's license under these circumstances. *In making any stop, whether the stop is to enforce the traffic laws or to carry out the officer's community caretaker function, an officer should be allowed to identify, with certainty, the person with whom he is dealing. This is necessary to protect himself and other officers from danger, to accurately prepare any required reports concerning his contact with the motorist, and*

*to allow the officer to adequately respond to allegations of illegal conduct or improper behavior.* Moreover, where it was determined that the person traveling with Godwin was operating her car without a driver's license, it was appropriate to determine whether Godwin had a driver's license and whether it was valid.

*There is also a valid public interest in permitting a police officer to run a record check on a driver's license under these circumstances. The need to identify the person with whom a police officer is dealing would logically extend to making a correct identification and determining the validity and status of the driver's license upon which the identification is based.*

Even if there is a legitimate public interest in requesting a driver's license and running a status check under the circumstances presented here, that interest must outweigh the nature of the intrusion in order to pass the Fourth Amendment test of reasonableness. We note, however, that the intrusion here was minimal. Godwin was already stopped at the roadside when Deputy Barbieri arrived. The officer's initial contact with Godwin was to determine whether he had Whitifield's driver's license. His further request for Godwin's license and his check on the status of that license constituted a very limited further encroachment upon any privacy interest protected by the Fourth Amendment. We therefore have little difficulty in concluding that such a limited intrusion was outweighed by the substantial public interest which supported Deputy Barbieri's conduct. This view is consistent with a uniform body of court decisions in other states that a police officer who has made an otherwise appropriate contact with a motorist, may request the motorist's license and run a check on that license without violating the driver's Fourth Amendment rights.

Also, as in *Ellenbecker*, I.C. § 49–316 [1] requires a driver to surrender a driver's

---

1. **49–316. License to be carried and exhibited on demand.**—Every licensee shall have his oper-

license to a police officer upon demand. This statute "implicitly recognizes" the public interest in allowing a police officer to ask for and check and driver's license by "giving a law enforcement officer the authority to require a driver of a motor vehicle to display his or her license on demand." *Ellenbecker*, 464 N.W.2d at 430. While the statute does not specifically authorize the officer to run a status check on the driver's license, both the Court of Appeals and the *Ellenbecker* court correctly pointed out that "[t]he statutory authority for police to demand a driver's license would mean little if the police could not check the validity of the license." 464 N.W.2d at 430. Running a license check validly fulfills two functions: it allows the officer to correctly identify the person with whom he is dealing and to determine if the license is valid.

Furthermore, we are aware that, under *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), police officers may not stop drivers at random to check documents, etc. However, our holding today does not authorize such a result. As the *Ellenbecker* court also pointed out, "Police officers do not have unfettered discretion to stop drivers and request a display of a driver's license.... However, this case does not concern an instance of unfettered discretion." 464 N.W.2d at 430. In fact, neither Officer Yount nor Officer Barbieri stopped Godwin—he voluntarily pulled over to wait for Ms. Whitifield. Therefore, given the public interests discussed above, and in light of the fact that this all happened very late at night on a remote, lonely highway,[2] Officer Barbieri's conduct in asking for and running a status check on Godwin's license was entirely reasonable.

ator's or chauffeur's license in his immediate possession at all times when operating a motor vehicle and shall, upon demand, surrender the license into the hands of a peace officer for his inspection. However, no person charged with a violation of the provisions of this section shall be convicted if an operator's or chauffeur's license issued to the person and valid at the time of his arrest is produced in court.

We therefore affirm the district court's decision to deny Godwin's motion to suppress.

BOYLE, J., concurs.

McDEVITT, J., concurs in the result.

McDEVITT, Justice, specially concurring:

I concur in the result reached by the Court in this case, but caution that this case not be read to provide a subjective test for the reasonableness of the seizure by the police officer of the defendant Godwin. This Court has established the standard to be used as follows:

> In this regard the officer's conduct must be judged against an "[o]bjective standard: would the facts available to the officer at the moment of the seizure or search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"

*State v. Hobson*, 95 Idaho 920, 523 P.2d 523 (1974), relying on *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

A "motorist assist" stop by a police officer, with no other factual predicate for inquiry, would not, in this writer's opinion, justify a demand for identification of the driver or occupants of the vehicle involved.

BISTLINE, Justice, dissenting.

## INTRODUCTION

Today the majority holds that a person who is lawfully parked on the side of the road can be seized by a police officer, forced to give up his driver's license and be detained without his consent while the officer runs a warrants check, even though there is not one iota of evidence suggesting that the person has been or is about to engage in any criminal activity and is clear-

2. Indeed, as the trial court noted, "Given the fact that traffic stops are said to be one of the, statistically speaking, one of the hazardous things officers have to do when they approach persons unknown to them and I think to have for Barberie [sic] to have done what he did it was not unreasonable."

ly not in need of police assistance. Such a result cannot be squared with the fourth amendment.

The Supreme Court, in *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1878–1879, 20 L.Ed.2d 889 (1968), enunciated the dual inquiry in determining whether a seizure is unreasonable under the fourth amendment, whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. To justify seizing a suspect, the officer must be able to point to specific and articulable facts which reasonably warrant the intrusion. Further, the scope of the interference must not be more intrusive than is necessary to accomplish the purpose for which the stop is authorized. *Terry*, 392 U.S. at 19, 88 S.Ct. at 1878. In this case, Officer Barbieri had no legitimate reason to seize Godwin. Additionally, even if there was a lawful reason, Officer Barbieri exceeded the scope of the reason by seizing the driver's license and detaining Godwin during the warrants check.

I

Before discussing the *Terry* dual inquiry, the first question to resolve is when Godwin was "seized" for purposes of the fourth amendment. The majority concludes that Godwin was seized at the time the officer required him to surrender his driver's license and, for the purposes of

this case, this author has no disagreement with that holding.[3]

II

The second question is whether that seizure was permissible under the fourth amendment. Here, the officer had no reason to seize Godwin because he had previously ascertained that Godwin was not in need of any assistance, was not in possession of Whitifield's driver's license and there was no reasonable suspicion that Godwin had committed any traffic offense or crime.

The United States Supreme Court by means of *Terry* requires that an officer be able to point to specific and articulable facts in order to warrant an intrusion. Here, Officer Barbieri stated that he contacted Godwin for two purposes. First, to ascertain whether Godwin was in need of assistance due to possible car trouble. Second, he wanted to see if Godwin was in possession of Whitifield's purse. However, Officer Barbieri already knew that Godwin's car was in perfect working order and that Whitifield's license was not in the purse *before* he asked Godwin for his license, as evidenced by his response to questions:

Q Okay. You say you would inquire whether there was any motor trouble. Did you ask, have any motor trouble?

---

3. It is clear that Godwin was seized at the point when he was forced to turn over his driver's license. In fact a powerful argument could be made that the seizure commenced at the time Officer Barbieri "activated his rear deck lights and pulled in behind Godwin's vehicle." Professor LaFave has written that "the use of flashing lights as a show of authority—will likely convert the event into a Fourth Amendment seizure." 3 W. LaFave, *Search and Seizure* § 9.2(h), at 417 (2d ed. 1987). The state courts have unanimously followed this view. *See, e.g., Ozhuwan v. State*, 786 P.2d 918 (Alaska 1990); *State v. Walp*, 65 Or.App. 781, 672 P.2d 374 (1983); *State v. Stroud*, 30 Wash.App. 392, 634 P.2d 316 (1981).

It certainly appears that a reasonable person would not have felt free to leave after Officer Barbieri turned on the rear deck lights. Had Godwin attempted to drive off after being so signalled, he arguably could have been charged

with a traffic infraction. *See* I.C. § 49–1419. Or, Godwin could have reasonably (but mistakenly) thought he could be charged with eluding a police officer, a violation of I.C. § 49–1404, if he disobeyed the implicit command to stay put. Greater legal minds than Godwin's have held the same belief. *See State v. Bedard*, 120 Idaho 869, 820 P.2d 1226 (1991) (Bakes, C.J. dissenting), wherein the Chief Justice argues that a person violates I.C. § 49–1404 if s/he wilfully disobeys a police signal to stop made "by whatever means."

However, because Godwin did not argue that he was seized when the rear deck lights were activated, the issue of whether a seizure then occurs is an issue better left for another day. For the purposes of this case, it does not matter whether the seizure occurred before he was asked to produce his driver's license inasmuch as all of the incriminating evidence was obtained after Godwin's driver's license was taken.

A  I didn't ask at that time because Officer Yount had asked me to look for a purse or to attempt to locate a driver's license for Miss Whitifield.

And I'd made contact with [Godwin] and asked if he was waiting for Mrs. Whitifield or Miss Whitifield and I came to the conclusion that he wasn't having any motor problems because his vehicle was running and he didn't mention anything.

. . . .

Q  Okay.  When you got to the car you readily concluded there was no need for assistance?

A  Motorist assist—yes I did.

Q  Okay.  So then you asked for the purse?

A  I asked him if there was a purse in there and he reached into the back seat and retrieved a purse.

. . . .

Q  When was it with respect to when you were checking out for the driver's license of Ms. Whitifield in the purse that you asked Mr. Godwin about his driver's license?

A  I believe I asked for the purse first and then I asked for his driver's license. I'm not one hundred per cent positive on the sequence at that time.

Q  Were you at the vehicle one time for that purpose?  In other words, did you go to the vehicle, ask for the purse and then ask for his driver's license as well?

A  Yes, I believe I did.

Q  Has Mr. Godwin committed any offense that you were aware of before you asked him for his driver's license?

A  No.

The Alaska Court of Appeals has held that in order "[t]o justify conduct that would amount to an investigative stop, an officer must be aware of at least some specific circumstances supporting a reasonable belief that the occupants of the vehicle need assistance." *Ozhuwan v. State*, 786 P.2d 918, 922 (Alaska 1990).  And, in a case factually similar to the one here, the Washington Court of Appeals held that the police cannot demand a driver's license after a motorist assist stop when it is clear that the motorist is not in need of any assist-

ance.  "[O]nce it became apparent that [the driver] was not disabled, [the officer] had no reason to proceed with the stop and no right to compel [the driver] to produce identification."  *State v. DeArman*, 54 Wash. App. 621, 774 P.2d 1247, 1249 (1989).

Here, Officer Barbieri knew Godwin was not in need of any assistance, the officer had possession of Whitifield's purse, and was unable to state any reason to believe that Godwin had violated any laws.  Officer Barbieri could not have and, in fact, did not have a reasonable belief that Godwin was in need of assistance.  The officer similarly had no reason to demand Godwin's driver's license.  Consequently, the seizure was improper at its inception. "Unless an officer has a reasonable suspicion that a driver is unlicensed or that he is otherwise subject to seizure for violations of the law, a seizure for the purpose of checking identification is unreasonable under the fourth amendment."  *State v. Day*, 461 N.W.2d 404, 407 (Minn.App.1990).

The majority opinion not only ignores the case law cited above, most of the cases it does cite are easily distinguishable.  In *State v. Reed*, 107 Idaho 162, 686 P.2d 842 (Ct.App.1984), the defendant was pulled over because of a defective tail lamp.  As part of that stop, the officer required the driver to produce proof of liability insurance.  The Court of Appeals held that the officer's demand was permissible under the fourth amendment as a because the defendant was legitimately seized as a result of his violation of traffic laws.  Here, Godwin did not commit a traffic violation nor was there any other reason to justify the seizure after Officer Barbieri's concerns about car troubles and Whitifield's purse were allayed.  *Reed* does not stand for the proposition that the police can detain citizens and demand to see their driver's licenses without reason.

Likewise in *State v. Tourtillott*, 289 Or. 845, 618 P.2d 423 (1980), the police had legally stopped the defendant at a game inspection road block.  All that *Tourtillott* stands for is that the police may demand a driver to produce his/her driver's license "when the driver is validly stopped."  As

there was no basis to seize Godwin, *Tourtillott* is inapposite.[4] The same distinction holds true for *State v. Aguinaldo*, 71 Haw. 57, 782 P.2d 1225 (1989). The defendant there stipulated that the stop of her vehicle at a sobriety checkpoint was constitutionally valid. All the Hawaii Court held in that case was that a police officer may demand the driver's license of a driver *"validly stopped."* (emphasis added)

Note that none of the majority's cases discussed above are "motorist assist" cases and accordingly do not discuss the level of articulable suspicion necessary for an officer to seize a driver while "assisting" him/her or the permissible scope of such stops. The only motorist assist case cited by the majority is *State v. Ellenbecker*, 159 Wis.2d 91, 464 N.W.2d 427 (App.1990). In balancing the public interest in the police actions against the right to be free from police interference, the Wisconsin Court of Appeals did rule in favor of the police in a holding which cannot withstand analysis.

> The reasonableness of seizures that are less intrusive than an arrest depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference from police officers.... Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.
>
> . . . .
>
> In the absence of basis for suspecting the appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference.

*Brown v. Texas*, 443 U.S. 47, 50–52, 99 S.Ct. 2637, 2640–41, 61 L.Ed.2d 357 (1979). In that case, the police observed Brown and another man walking away from one another in an alley in an area which had a high incidence of drug trafficking. When the police stopped Brown, he refused to identify himself to the police and was convicted of violating a Texas statute which made it a crime to refuse to identify one's self to the police. The Supreme Court held that the appellant could not be required to identify himself to the police because the police did not have a reasonable suspicion that the appellant was involved in criminal conduct. Here, like in *Brown*, there was no reason to justify the police interference with Godwin's right to person security and privacy. Godwin was not suspected of any criminal activity or of even committing a traffic violation.

The *Ellenbecker* court, therefore, ignored the teachings of *Brown* when it allowed the police officer to demand the driver's license and run a warrants check even though the driver was not suspected of any wrongdoing. The Wisconsin Court of Appeals tried to rationalize its result by arguing that "[a] community caretaker action is not an investigatory *Terry* stop and thus does not have to be based on a reasonable suspicion of criminal activity." *Ellenbecker*, 464 N.W.2d at 429. However, for the community caretaker exception to apply, the officer's activity must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973). Once it is clear that a driver does not need assistance the community caretaking purpose has been fulfilled. Any continued seizure turns the stop from a community caretak-

---

**4.** Ironically, the Oregon court has recently held that the police did not have authority to demand to see a driver's license in a case factually similar to the one at bar. In *State v. Farley*, 308 Or. 91, 775 P.2d 835 (1989), a police officer pulled over a vehicle because he did not see a license plate on it. As the officer approached the car, he noticed that the car had a temporary license in the windshield. Undeterred, the officer demanded the driver produce his driver's license and proceeded to run a warrants check on the driver. The Oregon Supreme Court held that the driver had been illegally seized because once the officer had observed the valid temporary permit, he had no reason to make any further inquiry regarding defendant's driver's license. Notwithstanding *Tourtillott*, what happened to Godwin would not have been tolerated in Oregon.

ing stop into an investigatory stop. The purpose for demanding the license and running the warrants check in both *Ellenbecker* and this case was to ascertain whether there was any basis to arrest the driver. That is an investigatory purpose which must be supported by a reasonable and articulable suspicion of criminal activity.

In light of *Brown*, the majority's attempt to distinguish this case from *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), is unconvincing. In that case, the Supreme Court held that:

> [E]xcept in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that a automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of the law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.

*Prouse*, 440 U.S. at 663, 99 S.Ct. at 1401. To this, the majority, rather lamely, says that *Prouse* is inapplicable because "this case does not concern an instance of unfettered discretion." In my view, when the police seize an individual even though there is no reason to believe the individual is in need of any assistance or that the individual has committed an offense, that is close enough to unfettered discretion to violate the fourth amendment. This is especially true when considered in light of *Brown* where the circumstances were much more suspicious than they were here.

Other state courts have held, in cases which involved the detention of the driver of a vehicle, that once the purpose of a detention has been satisfied and there is no reasonable suspicion to detain him further, the stop must end. *See People v. Pizzo*, 144 A.D.2d 930, 534 N.Y.S.2d 249, 250 (1988) (officer's demand to see driver's license to run warrant check was based on nothing more than "whim, caprice or idle curiosity" where officer had no reason to suspect the driver of any crime or traffic violation and was illegal); *State v. Damm*, 246 Kan. 220, 787 P.2d 1185 (1990) (Kansas

Supreme Court holds that the police may not run a warrants check on a driver who was stopped for defective tail lights absent a reasonable suspicion that there were outstanding warrants for the driver); *see also City of Fairborn v. Orrick*, 49 Ohio App.3d 94, 550 N.E.2d 488 (1988) (police may not ask driver of motorcycle to produce driver's license when basis of stop was that motorcycle passenger was not wearing a helmet).

Once Officer Barbieri ascertained that Godwin was not in need· of assistance and gained possession of Whitifield's purse, the legitimate purposes for his community caretaker contact with Godwin disappeared. Officer Barbieri's subsequent seizure of Godwin by demanding his driver's license and the running of the warrants check was an illegal investigatory stop because it was made without reasonable and articulable suspicion that Godwin had committed a crime or traffic violation as is required by *Terry*.

Thus, this Court need not determine whether a community caretaker seizure was reasonable because Officer Barbieri was conducting an investigatory seizure. Because the stop had to be supported by reasonable suspicion of criminal activity, the public interests found by the majority do not outweigh Godwin's right to be free from police interference.

As Chief Justice Burger wrote in *Brown:*

> The Texas statute under which appellant was stopped and required to identify himself is designed to advance a weighty social objective in large metropolitan centers: prevention of crime. But even assuming that purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is engaged in criminal activity, the guarantees of the Fourth Amendment do not allow it. When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits.

*Brown v. Texas,* 443 U.S. at 53, 99 S.Ct. at 2641.[5]

Finally, the majority cannot justify the demand for Godwin's driver's license by the fact that Whitifield did not have a driver's license. To the contrary, *Terry* requires individualized suspicion and a person's "mere propinquity" to others independently suspected of criminal action cannot justify a seizure. *See Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979).

This Court should follow the courts of Alaska and Washington and hold that a police officer may not demand a driver to surrender his driver's license during a motorist assist stop after it becomes clear the motorist is not in need of any assistance.

### III

The final step in the *Terry* analysis is determining whether the seizure exceeded the permissible scope of the intrusion. A detention under *Terry* must be temporary and last no longer than is necessary to effectuate the purposes of the stop. *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983).

Even if Officer Barbieri had the lawful authority to demand Godwin's driver's license, he exceeded the scope of that authority by continuing to hold Godwin while he ran a warrants check because he had no reason to suspect that Godwin driver's license was invalid or that Godwin was wanted on a warrant. *People v. McVey,* 185 Ill.App.3d 536, 133 Ill.Dec. 624, 541 N.E.2d 835, 837–38 (1989) (warrants check improper when driver explained to officer why he was parked and showed officer a driver's license which was valid on its face).

### CONCLUSION

Lest the majority forget, the law on this subject is still *Terry,* where the United States Supreme Court held that in order to justify an intrusion, an officer "must be able to point to specific and articulable

facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. at 21, 88 S.Ct. at 1880. *Ellenbecker* is simply wrong when it holds that an officer can seize a citizen after the purpose justifying the intrusion has dissipated. If the intrusion is based upon a perceived need for assistance and it becomes clear that assistance is in fact not needed, there are no specific and articulable facts to justify the intrusion. On being called upon to rely upon the Wisconsin Court of Appeals or the Supreme Court of the United States in a matter of federal constitutional law, it seems that the oath of office answers the question.

JOHNSON, J., concurs.

---

**5.** Likewise, I.C. § 49–316, which requires the operator of a motor vehicle to surrender his/her license upon a police officer's demand, cannot save the seizure here. In order to comply with *Brown,* that statute must be read to apply only when the officer has a lawful independent reason to seize the person.