# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 47892

| | |
|---|---|
| STATE OF IDAHO,<br><br>        Plaintiff-Respondent,<br><br>v.<br><br>MILDRED EILEEN COUCH,<br><br>        Defendant-Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

<div style="margin-left:3em">

Filed: October 22, 2021

Melanie Gagnepain, Clerk

</div>

Appeal from the District Court of the Third Judicial District, State of Idaho, Canyon County. Hon. Gene A. Petty and Hon. Darla S. Williamson, District Judges.

Judgment of conviction for possession of a controlled substance, <u>vacated</u>.

Eric D. Fredericksen, State Appellate Public Defender; Justin M. Curtis, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Justin R. Porter, Deputy Attorney General, Boise, for respondent.

---

LORELLO, Judge

Mildred Eileen Couch appeals from her judgment of conviction for possession of a controlled substance. We reverse the order denying Couch's motion to suppress and vacate Couch's judgment of conviction.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

An officer drove to a parking lot in response to a report that people in two vehicles were "smoking something off of tin foil" while parked there. The cars were described in the call report as a beige "Chev Cavalier" and a "gry toy pc" with 1A plates; the officer interpreted the latter to mean a gray Toyota passenger car with Ada County license plates. The call report also indicated there were "2 subjects" in both vehicles. When the officer arrived at the parking lot, he saw the Chevy Cavalier but noted the other vehicle was a silver Honda Civic with Ada County license

1

plates, not a Toyota passenger car. In addition, the Honda did not have two occupants as reported. Instead, the officer observed only one person, later identified as Couch, seated in the driver's seat. The officer approached Couch, informed her that he was there to investigate the report of drug use, and questioned her. Couch refused the officer's request to search her vehicle. When the officer asked her for identification, however, Couch produced her driver's license.

The officer then went to the other vehicle, obtained identification from two of the occupants, and gave the documents (including Couch's driver's license) to another officer to run through dispatch. Before dispatch reported back, a canine unit arrived at the scene and a drug dog alerted to the presence of drugs in Couch's vehicle. After the officer ordered Couch out of her vehicle, she admitted that she might have a methamphetamine pipe on her. Searches of her vehicle and person yielded two syringes, one of which contained methamphetamine residue, and a glass pipe. The State subsequently charged Couch with possession of a controlled substance and possession of drug paraphernalia.

Couch filed a motion to suppress, arguing that she was seized when the officer retained Couch's driver's license and that the officer lacked reasonable suspicion to justify this seizure. The district court denied her motion. The district court agreed that Couch was seized when the officer retained Couch's driver's license, but concluded the seizure was reasonable because the officer had a "legitimate reason to contact" Couch and, as such, the officer could "run her driver's license through dispatch to verify her identity and check the status of her driver's license."[1] Couch moved for reconsideration, which the district court denied. Couch subsequently entered a conditional guilty plea to possession of a controlled substance, I.C. § 37-2732(c)(1), and retained the right to appeal the denial of her motion to suppress. In exchange for Couch's guilty plea, the State dismissed the remaining count. Couch appeals.

## II.

## STANDARD OF REVIEW

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by

---

[1] District Judge Gene A. Petty denied the motion to suppress. District Judge Darla S. Williamson entered Couch's judgment of conviction and imposed the sentence.

2

substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

### III.

### ANALYSIS

Couch argues that the district court erred in applying the "legitimate reason" standard to conclude her seizure was reasonable because the Fourth Amendment requires a minimum of reasonable suspicion to support a detention. Couch further argues that, because the officer lacked reasonable suspicion, the district court erred in denying Couch's motion to suppress. The State responds that the district court correctly concluded that the seizure was reasonable under the legitimate reason standard articulated in the Idaho Supreme Court's opinion in *State v. Godwin*, 121 Idaho 491, 826 P.2d 452 (1992). The State also responds that the officer had reasonable suspicion of criminal activity that justified the seizure. We hold that Couch was seized when the officer discontinued contact with Couch and took her driver's license with him. We further hold that the officer did not have reasonable suspicion to support the detention.

Because Couch's claim involves an alleged unlawful seizure, the preliminary question is when the seizure occurred. The district court's written decision includes two different statements regarding the point of seizure. The first statement is that a seizure occurred when the officer "retained" Couch's driver's license because her "liberty was restrained" at that point. The district court's second statement is that Couch "was seized when [the officer] requested [Couch's] driver's license." On appeal, Couch essentially adopts the district court's first statement and argues that she was seized when the officer "took [Couch's] driver's license and then ran the license through police dispatch."

A seizure occurs for purposes of the Fourth Amendment when an officer, by means of physical force or show of authority, restrains the liberty of a citizen. *State v. Fry*, 122 Idaho 100, 102, 831 P.2d 942, 944 (Ct. App. 1991). A seizure does not occur simply because a police officer approaches an individual on the street or other public place, by asking if the individual is willing

3

to answer some questions, or by putting forth questions if the individual is willing to listen. *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Florida v. Royer*, 460 U.S. 491, 497 (1983). Thus, an officer may generally ask an individual questions and ask to examine identification, and doing so does not constitute a seizure so long as the officer is not on a "suspicionless fishing expedition," *Utah v. Strieff*, 579 U.S. 232, ___ (2016), and does not convey a message that compliance with the request is required, *Fry*, 122 Idaho at 102, 831 P.2d at 944.

The district court found that when the officer arrived in the parking lot where Couch was parked, the officer did not activate his overhead lights or impede Couch's vehicle from leaving the parking lot. The district court further found that Couch admitted her initial contact with the officer was not a seizure, recognizing the officer "could lawfully approach her and ask her questions, and she was free not to answer his questions." The officer could also ask to see Couch's identification or driver's license, and doing so did not constitute a seizure. *See Fry*, 122 Idaho at 102, 831 P.3d at 944. A limited seizure occurs, however, when law enforcement "retains" a valid driver's license "or other paperwork of value." *State v. Page*, 140 Idaho 841, 844, 103 P.3d 454, 457 (2004); *see also State v. Nickel*, 134 Idaho 610, 613, 7 P.3d 219, 222 (2000); *State v. Howell*, 159 Idaho 245, 248, 358 P.3d 806, 809 (Ct. App. 2015).[2] Couch's license was retained, and she was therefore seized, when the officer discontinued his contact with Couch and took her license with him.

Although the district court correctly characterized the retention of Couch's license as a seizure, it concluded the seizure was reasonable, citing the "valid" or "legitimate" reason rationale derived from the Idaho Supreme Court's decision in *State v. Godwin*, 121 Idaho 491, 826 P.2d 452 (1992) (plurality opinion), and this Court's subsequent decision in *State v. Landreth*, 139 Idaho 986, 88 P.3d 1226 (Ct. App. 2004). The State advances this same rationale in responding to Couch's argument that a legitimate reason is insufficient for a Fourth Amendment seizure and that

---

[2]    In *State v. Osborne*, 121 Idaho 520, 524, 826 P.2d 481, 485 (Ct. App. 1991), this Court also concluded that the defendant was seized when the officer "took" the defendant's license. In addition, the Court in *Osborne* held "as a matter of law that Osborne could not reasonably have believed he was at liberty to ignore the police presence and go about his business" when the officer asked to see Osborne's driver's license because I.C. § 49-316 required him to comply with the request since he was in the driver's seat of a vehicle with the engine running. *Osborne*, 121 Idaho at 524, 826 P.2d at 485. To the extent *Osborne* conflicts with the Idaho Supreme Court's opinion in *Nickel*, 134 Idaho 610, 7 P.3d 219, it has been implicitly overruled.

such seizure must be supported by reasonable suspicion. We agree with Couch that Fourth Amendment seizures require (at a minimum) reasonable, articulable suspicion to believe that the person detained is, has been, or is about to be engaged in criminal activity. *See Howell*, 159 Idaho at 248, 358 P.3d at 809 (explaining reasonable suspicion standard for investigatory detention).

The Fourth Amendment applies to all seizures of a person and requires such seizures to be reasonable. *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). The United States Supreme Court has stated that the reasonableness of a seizure "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law [enforcement]." *Brignoni-Ponce*, 422 U.S. at 878. This balancing test is the rationale underlying the United States Supreme Court's adoption of the now familiar standard in Fourth Amendment jurisprudence permitting an investigative detention based on reasonable suspicion. *See id.* (weighing governmental interest in illegal immigration to allow border patrol to briefly detain individuals "when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country"). We do not read *Godwin* or *Landreth* to eliminate this well-established constitutional standard, nor could we because the United States Supreme Court has sole authority to set the minimum standards for rights guaranteed by the United States Constitution. *See Missouri v. Frye*, 566 U.S. 134, 150 (2012) (noting that the United States Supreme Court has "established the minimum requirements of the Sixth Amendment . . . and States have the discretion to add procedural protections under state law if they choose"); *California v. Greenwood*, 486 U.S. 35, 43 (1988) (explaining that, while "[i]ndividual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution," it does not alter the Fourth Amendment); *see also Cooper v. California*, 386 U.S. 58, 62 (1967) (recognizing that the holding does not affect a state's power to impose higher standards on searches and seizures than required by the federal Constitution).

In *Godwin*, the defendant stopped his vehicle in response to an officer initiating a traffic stop on a vehicle the defendant (Godwin) was following. *Godwin*, 121 Idaho at 491, 826 P.2d at 452. Another officer driving by the traffic stop noted the second vehicle and pulled behind Godwin's vehicle for a "motorist assist." *Id*. at 452-53, 826 P.2d at 491-92. After learning that the person subject to the traffic stop believed her driver's license was in Godwin's vehicle, the

5

officer approached and contacted Godwin. *Id.* at 492, 826 P.2d at 453. During that contact, the officer requested and received Godwin's driver's license, which the officer took to his patrol vehicle to conduct a license check after instructing Godwin to remain in his vehicle. *Id.* The license check revealed Godwin's driver's license was suspended, and Godwin was arrested as a result. Godwin unsuccessfully moved to suppress evidence found following his arrest, which motion was based on his assertion that the request for his driver's license and subsequent license check violated the Fourth Amendment. *Id.* at 492, 826 P.2d at 453.

On appeal, Godwin challenged the denial of his motion and two justices affirmed. Those two justices wrote the lead opinion and concluded that a "limited seizure" occurred when the officer "took Godwin's license and told him to remain in his car." *Id.* at 493, 826 P.2d at 454. The two-justice lead opinion did not address whether there was reasonable suspicion for the seizure but, instead, analyzed whether the officer's conduct was reasonable, ultimately concluding it was. In reaching this conclusion, the lead opinion relied heavily on the reasoning from *State v. Ellenbecker*, 464 N.W.2d 427 (Wis. Ct. App. 1990), which detailed, among other considerations, reasons officers performing a motorist assist should be permitted to ask for a driver's license and run a status check on the license. Importantly, the "motorist assist" aspect of *Ellenbecker* was central to the Wisconsin Court of Appeals' decision in that case as evidenced by its statement: "A community caretaker action is not an investigative *Terry*[3] stop and thus does not have to be based on a reasonable suspicion of criminal activity." *Ellenbecker*, 464 N.W.2d at 429. We read the lead opinion in *Godwin* with this context in mind. Thus, the lead opinion in *Godwin* only reflects a conclusion that an officer may run a license check during a motorist assist, that is otherwise appropriate, so as long as the intrusion is minimal. *Godwin*, 121 Idaho at 495, 826 P.2d at 456 ("conclud[ing], as did the *Ellenbecker* court, that a police officer's brief detention of a driver to run a status check on the driver's license, after making a valid, lawful contact with the driver, is reasonable for purposes of the [F]ourth [A]mendment"). Because the officer in this case did not contact Couch for purposes of a "motorist assist," *Godwin* is inapposite.[4]

---

3        *See Terry v. Ohio*, 392 U.S. 1 (1968).

4        The lead opinion in *Godwin* was only joined by two justices. As such, any holding derived from the plurality opinion is limited by the single justice who concurred in the result and concurred specially to state, in part: "A 'motorist assist' stop by a police officer, with no other factual

As noted, the district court also relied on this Court's prior opinion in *Landreth*. In *Landreth*, an employee of a store reported that a truck was "moving from parking space to parking space in the . . . parking lot." *Landreth*, 139 Idaho at 987, 88 P.3d at 1227. An officer arrived and observed a truck in the parking lot that matched the description given by the employee. As the officer approached, he saw an extension cord running between the truck and the store. After being questioned by the officer, the driver of the truck, identified as Landreth, stated that the people in the store "knew him and knew what he was doing." *Id.* at 991, 88 P.3d at 1231. The officer requested and received Landreth's identification and provided dispatch with the information necessary to run a license check. In response, dispatch advised the officer that Landreth had an outstanding arrest warrant. As a result, Landreth was arrested and the officer discovered a controlled substance during a search incident to arrest. As in *Godwin*, Landreth filed an unsuccessful motion to suppress, contending that the officer's license check was an unlawful detention in violation of the Fourth Amendment. Considering this claim on appeal, this Court concluded that Landreth "failed to demonstrate any pertinent distinction between *Godwin* and the facts of [Landreth's] case." *Landreth*, 139 Idaho at 990, 88 P.3d at 1230. We reasoned that the initial contact with Landreth was consensual and that the "brief detention" to run a status check on the driver's license was reasonable under the Fourth Amendment. *Id.* at 991, 88 P.3d at 1231. Importantly, however, there was no indication in *Landreth* that the officer retained Landreth's driver's license thereby preventing him from leaving. While the license check was characterized as a "brief detention," the facts as described in the opinion do not indicate Landreth was detained as that term is generally defined for purposes of the Fourth Amendment. *See Bostick*, 501 U.S. at 434 (reiterating rule that an individual is not detained if a reasonable person would feel free to disregard police and "go about his business"). Rather, the officer in *Landreth* ran the license check during the consensual encounter. *Landreth*, 139 Idaho at 987, 991, 88 P.3d at 1227, 1231. To the extent *Landreth* can be read as authorizing a detention without reasonable suspicion, we disavow such a reading, particularly in light of subsequent decisions, including *State v. Cohagan*, 162 Idaho 717, 404 P.3d 659 (2017).

---

predicate for inquiry, would not, in this writer's opinion, justify a demand for identification of the driver or occupants of the vehicle involved." *Godwin*, 121 Idaho at 496, 826 P.2d at 457 (McDevitt, J., concurring).

In *Cohagan*, an officer approached Cohagan in a grocery store because the officer originally believed Cohagan was someone the officer knew and who had an outstanding warrant. However, by the time the officer made contact with Cohagan, the officer's belief that he knew him was dispelled. Nevertheless, the officer asked Cohagan for identification. After Cohagan provided his driver's license, the officer conducted a warrants check through dispatch. Although the officer did not leave Cohagan's presence, the Court concluded that the retention of Cohagan's license "resulted in an unlawful detention," reasoning that there was no bona fide investigation at that point and the officer was on a "suspicionless fishing expedition." *Id.* at 723-24, 404 P.3d at 665-66 (quoting *Strieff*, 579 U.S. at ___).

Read together, United States Supreme Court jurisprudence and Idaho precedent indicate that law enforcement may, consistent with the Fourth Amendment and without reasonable suspicion, contact an individual, request identification, *and* check the identifying information through dispatch so long as that encounter is not initiated for the sole purpose of checking identification. However, reasonable suspicion is required once law enforcement prevents someone from leaving by retaining that person's identification. Based on the report of drug activity in this case, the officer could approach Couch and ask for identification during the course of that interaction and doing so did not run afoul of the Fourth Amendment. However, once the officer retained Couch's driver's license by taking it, leaving Couch's presence, and giving it to another officer to run a license check, Couch was detained because a reasonable person in her position would not feel free to leave. Because there was a detention at that point, reasonable suspicion was required.

Reasonable suspicion must be based upon specific, articulable facts which justify suspicion that the detained person is, has been, or is about to be engaged in criminal activity. *State v. Sheldon*, 139 Idaho 980, 983, 88 P.3d 1220, 1223 (Ct. App. 2003). An officer may draw reasonable inferences from the facts in the officer's possession to support reasonable suspicion, and those inferences may be drawn from the officer's experience and law enforcement training. *State v. Montague*, 114 Idaho 319, 321, 756 P.2d 1083, 1085 (Ct. App. 1988). The reasonableness of the suspicion must be evaluated based on the totality of the circumstances at the time of the seizure. *State v. Ferreira*, 133 Idaho 474, 483, 988 P.2d 700, 709 (Ct. App. 1999).

8

Tips from informants about suspected criminal activity can support reasonable suspicion. *State v. Bishop*, 146 Idaho 804, 811, 203 P.3d 1203, 1210 (2009). To justify an investigative detention, however, the tip must bear sufficient indicia of reliability in light of the totality of the circumstances. *Id.* Factors indicative of reliability include whether: the informant reveals his or her identity and the basis of his or her knowledge; the location of the informant is known; the information was based on firsthand observations of events as they were occurring; the information the informant provided was subject to immediate confirmation or corroboration by police; the informant has previously provided reliable information; the informant provides predictive information; and the informant could be held criminally liable if the report were discovered to be false. *Id.* at 812, 203 P.3d at 1211.

Anonymous tips that merely describe suspects and implicate them in a crime generally do not, by themselves, support reasonable suspicion. *See id.* For example, an anonymous tip that described the race, shirt, and location of an individual and claimed that the individual possessed a gun was not sufficient to provide reasonable suspicion because the informant failed to explain "how he knew about the gun" and did not provide a "basis for believing he had inside information about" the individual. *Florida v. J.L.*, 529 U.S. 266, 268, 271 (2000). Moreover, there was no evidence indicating how quickly law enforcement responded to the tip. In contrast, an anonymous tip giving the direction of travel, location, license plate number, color, and make and model of a vehicle that the informant claimed had run her off the road about five minutes prior to the call had "adequate indicia of reliability for the officer to credit the [informant's] account." *Navarette v. California*, 572 U.S. 393, 395, 398-401 (2014). This information was sufficiently reliable under the circumstances because: (1) the informant's report of being run off the road "necessarily" implied that the informant had "eyewitness knowledge of the alleged dangerous driving"; (2) the "timeline of events suggest[ed] that the [informant] reported the incident soon after she was run off the road" and police confirmed the location of the vehicle about eighteen minutes after the call; and (3) the informant made a call to a 911 emergency system, which generally has "features that allow for identifying and tracing callers" that "provide some safeguards against making false reports with immunity." *Id.* at 400. Those features include recording a caller's voice, potentially allowing identification and prosecution of the informant for giving false information; identifying the caller's geographic location; and obtaining the phone number of the caller even if the caller

9

attempts to "block call recipients from obtaining their identifying information." *Id.* at 400-01. However, the United States Supreme Court cautioned that "none of this is to suggest that tips in 911 calls are *per se* reliable" and noted that the facts in *Navarette* presented a "close case." *Id.* at 401, 404.

In Couch's case, the district court found that the officer relied on "information provided by an anonymous tip." The State contends the tip "bore sufficient indicia of reliability and was sufficiently corroborated by the officer's independent observations to justify Couch's seizure." First, the State argues that "the source of the tip was readily ascertainable" because the informant's "callback number was recorded in the dispatch notes." In support, the State cites *State v. Larson*, 135 Idaho 99, 102, 15 P.3d 334, 337 (Ct. App. 2000), where we held that an informant whose name was not given "was not an anonymous caller" because the informant "gave her address and thereby made her identity readily ascertainable" and "was plainly not attempting to conceal her identity from police." However, there is no similar indication or finding that the informant in Couch's case was willing to be held accountable for the information provided in the tip. Although the informant's phone number was automatically recorded, there is no evidence that the informant voluntarily provided the phone number or knew the phone number would be recorded. The phone number provides a potential avenue to identify the informant but, standing alone, does not suffice to make the informant's identity "readily ascertainable." *See United States v. Freeman*, 735 F.3d 92, 98 (2d Cir. 2013) (holding that having phone number of informant failed to provide indicia of reliability because informant was not "tracked down, so there is no way . . . to determine that the number actually would trace back to the individual who made the phone call" and there was "nothing offered to suggest . . . that the phone was not a prepaid phone, which would be as anonymous as a call placed from a public pay phone"). *But see United States v. Gomez*, 623 F.3d 265, 269 (5th Cir. 2010) (noting that automatic caller identification increases reliability of tips by allowing police to identify informant).

Second, the State asserts the record implies the informant had "first-hand observations of the events as they were occurring." The dispatch notes of the call indicate that, after describing two vehicles containing two people each who were using tin foil to smoke drugs, the informant was "no longer on scene." The State contends that the words "no longer on scene" indicate that the informant was present during part of the call and that this, combined with the level of detail of

the informant's report, shows the informant personally witnessed the events reported. While the words "no longer on scene" indicate that the informant was present at the scene at some point, being present does not necessarily imply that the informant had personal knowledge. Much like the anonymous tipster in *J.L.*, the informant failed to explain how he or she came to know the information reported. In addition, unlike the informant's report in *Navarette* of being run off the road, nothing in the informant's tip in Couch's case necessarily implies that he or she had personal knowledge. As for the level of detail, the facts reported by the informant are only slightly more detailed than the description of the suspect in *J.L.*

Third, the State contends that the officer "immediately confirmed significant details provided by the tipster." On this point, Couch asserts that the informant's tip was not entirely accurate as evidenced by the discrepancies between the tip and the officer's observations. For instance, the officer did not find a gray Toyota with two people in it, as the informant claimed, but instead found a silver Honda with one person. However, the difference in color and vehicle make is not significant. At the suppression hearing, the officer testified that, in his training and experience, it is common for reporting parties to get small details incorrect, such as the make of a vehicle. As for the discrepancy in the number of individuals in the vehicle, the officer testified that Couch informed him that she had grandchildren (or a single grandchild)[5] with her in the Honda, but had transferred the grandchildren to the other vehicle before the officer arrived. Although this could explain the informant's report of two people in the Toyota, the officer's testimony does not indicate whether he learned about the grandchildren before or after detaining Couch. In short, the officer corroborated some details of the informant's report, providing some indicia of reliability. What is lacking, however, is confirmation of the details regarding the alleged criminal activity.

Overall, we conclude that Couch's case is closer to *J.L.* than *Navarette*. Unlike the unknown response time in *J.L.*, the officer in Couch's case responded quickly and corroborated some details of the tip. In addition, although there was no evidence presented at the suppression hearing that the informant called a 911 emergency service line (the officer merely testified that he received a call from "dispatch"), or that the call was recorded, the dispatch notes contain the

---

[5]     The officer was not entirely sure about the number of grandchildren involved.

informant's callback number. Thus, some of the features of a 911 emergency system noted in *Navarette* that increase the reliability of a tip were present. However, similar to *J.L.*, the informant gave the location and description of the vehicle Couch was in and alleged the individuals were engaged in drug activity but did not explain how the informant had personal knowledge of the alleged criminal activity and the facts of the tip did not necessarily imply such personal knowledge. The officer's quick corroboration of some details, combined with a phone number, does not make this case significantly different than *J.L.* Consequently, the anonymous tip, standing alone, was not sufficiently reliable to support reasonable suspicion.

The remaining question is whether any facts observed by the officer prior to detaining Couch, combined with the information from the anonymous tip, established reasonable suspicion. Aside from observations corroborating some details of the tip, the only other fact supporting reasonable suspicion of criminal activity was Couch's demeanor. At the suppression hearing, the officer testified that Couch avoided eye contact and appeared nervous, agitated, and angry during the initial consensual encounter which, in the officer's training and experience, indicated that Couch was lying or "trying to hide something." Although Couch's demeanor is one factor that supports reasonable suspicion, it is insufficient when considered by itself. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (noting that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"); *State v. Gibson*, 141 Idaho 277, 285-86, 108 P.3d 424, 432-33 (Ct. App. 2005) (holding that "a person's nervous demeanor during . . . an encounter is of limited significance in establishing the presence of reasonable suspicion"). Even when combined with the other information available to the officer, Couch's demeanor was insufficient to support reasonable suspicion to detain her. Consequently, Couch's motion to suppress should have been granted.

## IV.

## CONCLUSION

Because Couch could not be detained based on a legal standard requiring less than reasonable suspicion, and because the officer lacked reasonable suspicion to detain Couch, Couch's motion to suppress should have been granted. Consequently, we reverse the order denying Couch's motion to suppress and vacate Couch's judgment of conviction for possession of a controlled substance.

Chief Judge HUSKEY and Judge GRATTON, **CONCUR**.